# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CHRISTOPHER FOSTER,                                    Case No. 1:16-cv-920

              Plaintiff,                               Black, J.
                                                       Bowman, M.J.
       v.

STATE OF OHIO, et al.,

              Defendants.

## REPORT AND RECOMMENDATION

       Plaintiff is a prolific prisoner litigant, filing multiple motions in numerous cases in

the state and federal courts.[1]   To date, the undersigned has filed six Report and

Recommendations ("R&Rs") in this case, as well as numerous orders.   This seventh

Report and Recommendation ("R&R") addresses: (1) Plaintiff's third motion for summary

judgment (Doc. 108) and Defendants' motion for summary judgment on the only two

claims remaining in this case.   (Doc. 113).   For the reasons that follow, Defendants'

motion should be GRANTED, Plaintiff's motion should be DENIED, and this case should

be DISMISSED.

---

[1] *See, e.g.,* Southern District of Ohio Case Nos: 1:14-cv-617; 1:14-cv-668; 1:14-cv-642; 1:15-cv-595; 1:15-cv-713; 1:16-cv-835;1:16-cv-846 and Northern District of Ohio Case Nos. 3:15-cv-404; 3:16-cv-658; 3:16-cv-2109; 3:16-cv-2168; 3:15-cv-2256; 3:16-cv-476; 3:16-cv-1535; 316-cv-1715.  In addition, Plaintiff has filed at least fourteen cases in the Ohio Court of Claims alone, plus many additional cases in the Franklin Court of Common Pleas. Plaintiff has been sued by the Ohio Attorney General under Ohio Revised Code R.C. §2323.52 for his vexatious litigation.  *See Ohio State Attorney General Mike Dewine v. Christopher Foster,* Case No. 16-cv-2732.  Plaintiff also has litigated five actions in the Ohio Supreme Court.  (Doc. 80 at 5-6). Not only has Plaintiff filed a large number of cases, but he inundates the courts with motions in the cases that he pursues. Plaintiff had filed at least 43 separate motions in this record alone, not including dozens of non-motion filings.  Plaintiff's filings continue to consume a disproportionately large amount of this Court's judicial resources as compared to other pro se or even the prisoner litigant population at large.

## I. Background[2]

Plaintiff, who is currently incarcerated at the Southern Correctional Facility (SOCF), filed this §1983 action alleging violations of his civil rights while he was incarcerated at the Toledo Correctional Institution (ToCI), and after his transfer to SOCF. Plaintiff previously had filed three or more cases that had been dismissed at the screening stage, prompting initial review under 28 U.S.C. § 1915(g), a "three strikes" provision included in the Prison Litigation Reform Act ("PLRA") intended to prevent frivolous and/or vexatious prisoner litigation.

Plaintiff's original complaint in this case alleged that while at ToCI, Plaintiff suffered poor treatment, including but not limited to the improper disposal of his legal work and other property. In September 2014, he was transferred to SOCF, where Plaintiff alleged that he was subjected to racist and derogatory remarks, and was physically assaulted by a number of officers, including Defendants Rankin, Southworth, Neff, Parish, John Doe, and possibly Workman. Plaintiff alleged that Defendant "Dr. Ahmed Fiscal" denied him medical care after the assault and continues to deny him care for a skin disease. The original complaint contains additional allegations regarding Plaintiff's conditions of confinement, as well as an attack on Plaintiff's conviction and sentence. Plaintiff's original complaint identified more than thirty individual defendants and several institutional defendants, including: the State of Ohio, Toledo Correctional Institution (ToCI), SOCF, and "several State actors" including Warden John Coleman, Lt. Beiderman, Kelly Robertson, several groups of unnamed correctional officers, Correctional Officers ("C/Os") Southworth, Rardin, Neff, T. Parish, Cpt. Workman, Roger Wilson, Dr. Ahmed

---

[2]Most of this same background was set forth in the undersigned's last R&R but is repeated herein for the convenience of the Court.

Fiscal (later corrected to Dr. Faisal Ahmed), DWSS Cadogan, DWO Cool, WMA Davis, Warden Morgan, C/O Steve Carter, Major Warren, Ms. Aldridge, Sgt. Bear, Sgt. Felts, O'Connor, Oppy, Hammerick, Lt. Phillips, Nurse Coons, Danhoff, Ohio Attorney General Mike DeWine, Assistant Attorney General Christopher Bagi, DWO Bowerman, Lt. Copley, David Bobby, and Warden Erdos. (Docs. 1, 2).

Based upon the number of prior dismissals of Plaintiff's frivolous lawsuits, the undersigned filed an initial R&R more than two years ago, on October 11, 2016, recommending that Plaintiff's motion to proceed *in forma pauperis* in this case be denied, and that this case be dismissed unless Plaintiff immediately paid the full filing fee. The relevant statutory provision, 28 U.S.C. § 1915(g), prohibits frequent filers with a similar history of dismissals from "proceeding IFP 'unless the prisoner is under **imminent danger** of serious physical injury.'" *Bruce v. Samuels*, 136 S. Ct. 627, 630 (2016) (citing 28 U.S.C. § 1915(g), emphasis added).

On December 5, 2016 the presiding district judge rejected that first R&R, concluding that Plaintiff had alleged "imminent danger" in a manner that permitted him to file this lawsuit without prepayment of a filing fee, based upon four separate documents that were not before the undersigned at initial screening, but instead were filed in response to the first R&R. (Doc. 9 at 3). The Court liberally construed the collection of documents as objections, since "[e]ach of these filings attempt to address the …recommendation that Plaintiff be denied *in forma pauperis* status pursuant to 28 U.S.C. § 1915(g)." (Doc. 9 at 1-2). The Court specifically cited new allegations that "[s]taff members have been planning their next attack on me," and that Plaintiff does not "know when the C/Os that once attacked me previously or Bare [sic], the sergeant that threatens

to attack me regularly here is going to act," (*id.*, citing Docs. 7 and 8), as well as Plaintiff's reference to being denied medical treatment for a "skin disease."[3] (*Id.*)

Based upon the rejection of the R&R dismissing this lawsuit under 28 U.S.C. §1915(g), the undersigned re-screened Plaintiff's initial complaint, together with a new document filed on January 27, 2017. (Doc. 10). The latter document was not captioned as an amended complaint, but instead was captioned: "The Contemporaneous Imm[i]nent Danger Described Has Occurred In Majority, Evolved & Escala[t]ed." (*Id.*) Consistent with the presiding district judge's liberal construction of Plaintiff's confusing assortment of filings, the undersigned construed several new allegations contained in the document as a supplement or amendment to Plaintiff's original complaint. (*See* Doc. 12, discussing Doc. 10).

Pursuant to a second R&R filed on February 28, 2017 and adopted on April 18, 2017, the Court dismissed most claims and defendants, but permitted certain claims to go forward against Defendants Rardin, Southworth, Neff, Parish, John Doe, Workman, Warden Erdos, Dyer, Bear, and Dr. Ahmed. Specifically, the Court permitted the following four claims:

> (1) Eighth Amendment excessive force claims against defendants Rardin, Southworth, Neff, Parish, John Doe, and Workman based on plaintiff's allegation that these officers attacked him upon his arrival to SOCF; (2) excessive force claim against Sgt. Bear based on the January 17, 2017 attack; (3) deliberate indifference claim against Dr. [Faisal Ahmed]; and (4) conditions of confinement claims at SOCF, including plaintiff's claims regarding wheelchair accessibility, against defendants Warden Erdos, Dyer, and Bear.

---

[3]In his response in opposition to Defendants' motion for summary judgment, Plaintiff identifies his "skin disease" as "contact dermatitis and eczema." He states he previously has been prescribed medicated soap that he uses when showering. (Doc. 116 at 10).

(Doc. 12 at 12, adopted at Doc. 25).[4] Ironically, after service of the complaint/supplemental complaint on those four claims, the undersigned discovered that Plaintiff had previously filed other similar complaints that had been dismissed based upon the referenced "three strikes" provision and/or for failure to pay the requisite filing fee.[5] As the undersigned previously explained, however, it is unclear whether the prior dismissal(s) would bar the instant suit, given Plaintiff's new assertion of "imminent danger." (*See* Doc. 43 at 6).

In any event, other than the four referenced claims, the Court found that Plaintiff had failed to state a claim upon which relief may be granted and recommended full dismissal of "the remainder of the complaint." (Doc. 12 at 12). The Court determined that Plaintiff could not recover monetary damages because the State of Ohio enjoys Eleventh Amendment immunity. The Court also dismissed all claims against ToCI, SOCF and the Ohio Department of Rehabilitation and Correction, since only "a person" acting under color of state law is subject to suit or liability under 42 U.S.C. §1983. Additionally, the Court dismissed Plaintiff's conspiracy claims as insufficient to state a claim upon which relief may be granted. The Court dismissed Plaintiff's claims relating to the failure to investigate and/or respond to his grievances as insufficient to state a claim under § 1983.

---

[4]Plaintiff asserts that he requires a wheelchair based upon gunshot wounds suffered in 2011. (Doc. 1 at 2).
[5]In *Foster v. Ohio*, Case No. 1:15-cv-595, 2015 WL 6542408 (S.D. Ohio Oct. 29, 2015), Magistrate Judge Litkovitz recommended the dismissal of an earlier complaint by Plaintiff that contained similar allegations. The undersigned did not become aware of the similarity until subsequent review of this complaint and comparison with Plaintiff's past filings. In Case No. 1:15-cv-595, Judge Black severed claims against the ToCI Defendants and transferred them to the Northern District of Ohio. However, upon initial screening in that district, the Northern District also dismissed on the basis of the three strikes provision. *See e.g., Foster v. Ohio*, Case No. 3:15-cv-2256, 2016 WL 537475 (N.D. Ohio Feb. 11, 2016). *See also, generally,* Northern District of Ohio Case No. 3:16-cv-2168 (Order of 11/17/16 dismissing case as barred by three strikes rule and as duplicative of Case No. 3:16-cv-2109, alleging that Plaintiff has been assaulted, pulled from his wheelchair, thrown to the floor, punched and kicked upon transfer to LCCC, with property unlawfully taken, with additional allegations that his wheelchair was taken and that he has not received medical treatment).

The Court held that Plaintiff also failed to state a claim with respect to the alleged destruction of his personal property, whether that claim was brought as a due process claim or, with respect to the alleged destruction of his legal materials, as a First Amendment right of access to the courts. The Court held that Plaintiff could not challenge the validity of his criminal conviction or continued incarceration in this civil rights case. The Court also dismissed any claims seeking to hold multiple defendants liable for threats and verbal harassment, since such allegations are not sufficient to state a viable claim under the Eighth Amendment.  Finally, the Court dismissed a long list of "conclusory" allegations against an even longer list of would-be individual defendants:  Steve Carter, Major Warren, Roger Wilson, O'Connor, Oppy, Hammerick, Lt. Phillips, Coons, Danhoff, John Doe, Nurse Koons, Mike DeWine, Christopher Bagi, D.W.O. Bowerman, Lt. Copley, and David Bobby.  (*See* Doc. 12 at 11-12).

 Initially, service was perfected only on Defendants Rardin, Parish, Bear, Erdos and Dyer.  Defendants John Doe and Southworth (who died in 2014) were dismissed pursuant to a third R&R filed on June 12, 2017 and adopted on August 16, 2017. (Docs. 43, 56).  The Court also denied multiple motions filed by Plaintiff seeking default judgments against various Defendants based upon their alleged failures to answer or otherwise respond to Plaintiff's complaint.  (*Id.*)  Summons was later issued to Defendants Neff, Workman, and Dr. Ahmed. (Docs. 43, 44, 45).  All Defendants then filed answers and/or amended answers and moved for judgment on the pleadings.  (Docs. 62, 63, 65, 66, 67).

Throughout this case, Plaintiff kept up a frenetic pace of motion practice.  In an Opinion and Order filed on November 2, 2017, the undersigned warned Plaintiff that future

repetitive and frivolous motions would be summarily denied.  (Doc. 77 at 11).  On the same date, the undersigned filed a fourth R&R that recommended the denial of five of Plaintiff's dispositive motions.  (Doc. 78).  Plaintiff filed multiple documents that were again liberally construed by the presiding district judge as objections (and supplements to objections) to the fourth R&R, all of which the Court found to be "without merit."  (Doc. 81 at 1, n.1).  In overruling Plaintiff's objections, the presiding district judge cautioned Plaintiff, warning him that his filings have been in violation of Fed. R. Civ. P. 11, because they "consist largely of foul, repetitive, and completely unsubstantiated denigrations of the Magistrate Judge's impartiality and character," and placed him on notice that "[f]urther such behavior will not be tolerated" and "will result in sanctions, potentially including the summary dismissal of this case." (Doc. 81 at 2, n.1).

On March 28, 2018, the undersigned filed a fifth R&R recommending that Defendants' motion for judgment on the pleadings be granted as to claims that multiple Defendants employed excessive force against Plaintiff shortly after his arrival at SOCF in September 2014 and that, also in 2014, Dr. Ahmed was deliberately indifferent to his serious medical needs.  The undersigned further recommended that judgment be granted for all claims brought against Defendant Warden Erdos, whether in his individual or official capacity.  (Doc. 98).  On May 18, 2018, U.S. District Judge Black overruled Plaintiff's objections and adopted that R&R for the opinion of the Court.  (Doc. 101).

Following entry of Judge Black's May 18, 2018 Decision and Entry Adopting the fifth R&R, only two claims and two Defendants remain: (1) Plaintiff's excessive force claim against Defendant Sgt. Bear based upon an incident that allegedly occurred on January 19, 2017 that was detailed in the construed "supplement" to Plaintiff's complaint and (2)

a general "conditions of confinement" claim against Defendants Dyer and Bear at SOCF, including Plaintiff's claims regarding wheelchair accessibility in disciplinary segregation. Of note, neither claim appeared in Plaintiff's original complaint. Instead, the two claims that remain were alleged for the first time in the January 27, 2017 document construed as an amendment or supplement to the original complaint. (*See* Doc. 10).

On September 12, 2018, the undersigned filed a sixth R&R in which I recommended denying multiple additional dispositive motions filed by Plaintiff, including: (1) a motion for sanctions; (2) a motion to reconsider the March 28, 2018 R&R and/or to reverse Judge Black's adoption of that R&R; (3) a motion for summary judgment in Plaintiff's favor on previously dismissed claims, and (4) a multi-part "Combined Motion Trumping Penological Interest That are Not [Legit], Amending (Doc. 104) In Part and Spitting Its Rule 56 Merits, And As to the Trump for ADA Transfer (Doc. 105)." (Doc. 112). In that same R&R, the undersigned stayed consideration of Plaintiff's third motion for summary judgment, (Doc. 108),[6] pending the anticipated filing of a motion for summary judgment by the Defendants. Defendants filed the anticipated cross-motion on September 13, 2018. (Doc. 113).

In this seventh R&R, I now recommend granting the motion of Defendants Dyer and Bear for summary judgment and denying the Plaintiff's repetitive third motion.

---

[6]The September 12, 2018 R&R noted that Plaintiff had filed two separate "reply" memoranda in support of his motion for summary judgment, together with what appears to be 28 pages of identical exhibits attached to each reply. In addition, the undersigned stated that "[i]n the interests of justice, the undersigned will consider the Exhibits attached as Doc. 105-1 in connection with Plaintiff's most recent (third) iteration of his motion for summary judgment, to the extent that the exhibits may be relevant to his claims or argument presented." (Doc. 112 at 13 and n.1). In the context of this seventh R&R, the undersigned has fully considered both reply memoranda and all of the referenced exhibits. (*See* Docs. 105-1, Docs. 110-111).

## II. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548 (1986).

Once the moving party has met its burden of production, the nonmoving party cannot rest on the pleadings, but must present significant probative evidence in support of his case to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248-49. The mere scintilla of evidence to support the nonmoving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the nonmoving party. *Id.* at 252. As Plaintiff is a pro se litigant, his filings are liberally construed. *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005). However, his status as a pro se litigant does not alter his burden of supporting his factual assertions with admissible evidence when faced with a summary judgment motion. *Maston v. Montgomery Cnty. Jail Med. Staff Personnel*, 832 F. Supp. 2d 846, 851-52 (S.D. Ohio 2011) (citing *Viergutz v. Lucent Techs., Inc.*, 375 Fed. Appx. 482, 485 (6th Cir. 2010)).

In this case, both Plaintiff and Defendants are moving parties. The undersigned

has evaluated each of the respective motions for summary judgment according to the above standards of review. Because the undersigned has concluded that Defendants' motion should be granted, the undersigned has construed all *reasonable* factual inferences in Plaintiff's favor.

### III. Plaintiff's liberally construed "amendment" to his complaint (Doc. 10)

Prior to stating the findings of fact supported by the record in this case, the undersigned first restates the allegations relevant to the only two remaining claims. As stated, neither claim was included in Plaintiff's original complaint; Defendant Dyer was not even mentioned in that pleading.[7] Instead, the two claims were newly alleged in an 8-page, handwritten single-spaced document that was docketed on January 27, 2017 as "The Contemporaneous Immenent [sic] Danger Described has Occurred in Majority, Evolved & Escaladed [sic]." (Doc. 10). The undersigned construed and re-screened those new allegations as an "amendment" to Plaintiff's original complaint. Although the document is somewhat rambling in nature, the construed amendment contains the sole allegations that state any non-frivolous claim against Defendants Bear and Dyer.

The allegations against Bear and Dyer not only are distant in time from the events detailed in the original complaint, but occurred just days prior to the filing of the construed amended complaint.[8] In relevant part, Plaintiff alleges:

---

[7]In objections to the sixth R&R, Plaintiff points out that the undersigned erred in overlooking (in that R&R, though not in prior R&Rs) a cursory reference to Defendant Bear in the original complaint. (Doc. 1 at 4). Plaintiff is correct. To be fair, his original complaint referenced 30 individuals, plus numerous "John Does" plus three entity defendants. (*See* Docs. 1, 12). Still, included in the original complaint was an accusation that Bear "threatened me and enforced torture" on an unspecified date. Along with other conclusory allegations, the original allegation against Bear was dismissed for failure to state any claim. (Doc. 12 at 11). Aside from the failure to note the cursory reference to Bear, the sixth R&R accurately details the unusual procedural history of this case, including the construction of Plaintiff's allegations in the document filed on January 27, 2017 as asserting new claims against both Sgt. Bear and Officer Dyer. (*See generally*, Doc. 98 at 13-16 (discussing Doc. 10)).

[8]As the undersigned has previously noted, Plaintiff's original complaint primarily concerned events that

…The State is literally putting forth efforts to do more than estopple [sic], they are disabling me in attempt.

But I am negative and in full resistance of their efforts. The Sgt's Bear and Felts mentioned in the complaint of this litigation were notified that case 1:16-cv-846 would have specific requirements on the 18th of January. So they continued to send staff to go to the cell I was housed in & harass me so to induce panic. On the (19th) nineteen at 6 am, Thursday of January last week, I reported for my hygiene so that I could go take a shower. I was told that I can use toothbrush, toothpaste, soap, deodorant etc., and at that time I requested to see a Lt., whom came shortly after. Lt. Dyer made disrespectful remarks while walking past the cell and blatantly denying me my property and hygiene. I was distraught, minutes later Sgt. Bear came through the cage directly to the bars at the cell I was housed. He replied, "fuck you Bitch! We not letting you do shit motherfucker." He then began to dispense mace from a very large "fogger can" into my face. I saw a battery nearest me and threw it at him to make him stop. Sgt. Bear left for a few minutes and returned, immediately with another can of mace aimed directly at me in the cell, saying cuff the fuck up bitch, so I can put you out of your misery." Before I could get a word out of my mouth he emptied the can drowning me in mace. I refused to cuff, as I continued to try getting the mace out of my face. The entire unit of … inmates began to go bonkers at the CO's. Then a group of CO's came with Lt. Dyer, the guy I described that came before [Bear]. They had a big gun, vests, shield, helmets, etcetera, ordering me to cuff up. Once I wheeled over to them in my wheelchair and cuffed up, they opened the cell, wheeled me to the steps of the unit & grabbed me out of the wheelchair spontaneously, dragging me up the stairs (both my hands and ankles shackled).

They wheeled me to K-2, another unit (from J-3 cell3 handicap cell). Entering K-2, they (with help of D. Smith) pulled me out of the wheelchair spontaneously and dragged me down the stepps [sic], this time making sure my feet hit every step, all the way to cell 6. In this cell 6 of the multiple tortfeasors, stripped me naked and after discarding my boxers, socks, thermals etc. gave me a jail shirt and jail pants. I was left in the cell with no wheelchair or Amer. With Dis. Act. Accessibility (nowhere in this unit, nor my property) (keep in mind I was injured after being pistol shot 16 times at point blank range by a malicious individual…). I sat on the steel bunk, only to observe the blood all over the floor walls and sink of this disgusting

occurred in 2014 upon Plaintiff's transfer to SOCF, whereas the construed amendment, dated January 25 and filed January 27, 2017, concerns an incident that occurred days earlier. Ordinarily, the PLRA precludes an inmate from bringing any federal claim prior to exhausting an administrative grievance procedure. It would have been logistically impossible for Plaintiff to have administratively exhausted his January 2017 claims. Defendants previously raised a "failure to exhaust" defense, among many other affirmative defenses. (*See generally* Docs. 34, 51, 66, 67). However, they appear to have waived that defense by failing to raise it on summary judgment.

condemned moldy cell. I happen to speak to a guy on the range who yelled from his cell informing me he had just wrote an ICR about the dude whom spilled his blood all in the cell by cutting himself. I attached what he filed to the institution; answer as well.

I just received an envelope and some paper/pen, from a neighboring inmate to write this. I am in a cell (Cell 6- K2). No wheelchair, or accessibility, confined strictly to a bed. I was given nothing but a mattress (dirty and old) and one sheet, one blanket, my undergarments, legal work, property, wheelchair, etcetera, are at large. I am not allowed to access phone, commissary, a shower, or medical needs for my skin disease.

I am sure that it will get worse as they have informed me they are going to destroy me after they finish blocking my legal work….

(Doc. 10 at 2-4). In what he captions as a conclusion, Plaintiff pleads "for the state tortfeasors to be summonsed so that they pull back on the death blow they have in store. I am a major asset to the United States as a Nation in a selfless meaning, concerning strengthening as an aid to the U.S. culture." (*Id.* at 4).

## IV. Findings of Fact

As reflected in the exhibits filed by Defendants as well as some exhibits filed by Plaintiff, most of the allegations contained in the construed amended complaint are contradicted by the record.

During the early morning hours of January 19, 2017, Plaintiff was being housed in cell 3 of Unit J3 of SOCF. Although neither Plaintiff's original nor construed amendment to his complaint make any reference to non-party C/O Malone, there is no dispute that Plaintiff's interaction with C/O Malone (and not Dyer as Plaintiff alleged) precipitated the incident at issue. Specifically, around the time he was to be escorted to the shower by C/O Malone, Plaintiff requested a bar of medicated soap that Plaintiff maintains he requires for his contact dermatitis and eczema. (Doc. 116 at 12-13). However, C/O Malone "denied" Plaintiff soap, eliciting an angry reaction from Plaintiff. (Doc. 113-2 at

17, Incident Report stating that Malone informed Plaintiff that they were "out" of the soap; *contrast* Doc. 116 at 10, asserting that Malone was "denying Foster his medicated soap").

Malone stated in a contemporaneously dated Incident Report that Plaintiff grabbed at Malone through his cell bars. (Doc. 113-2 at 17). When Sgt. Bear arrived to do his usual rounds, Malone informed him of Foster's agitated response. (Doc. 113-2 at 9; *see also* Doc. 113-2 at 86). Accompanying Malone, Sgt. Bear returned to Plaintiff's cell shortly thereafter, whereupon Plaintiff threw batteries at both officers, striking Malone and/or Bear.[9] Reacting, Sgt. Bear deployed his OC spray[10] for the first time; both Malone and Bear left the range shortly thereafter.

Among the exhibits that support the findings of fact in this case is a video record filed by Defendants in support of their motion, which contains three video clips, identified as Videos A, B, and C. (*See* Doc. 119-1).[11] Plaintiff has repeatedly claimed both in one of his responses to the Defendants' motion for summary judgment, and in a subsequent "motion to strike" the video evidence, that he has been denied adequate opportunities to

---

[9]Malone variously stated that a battery struck him in the lower left leg and/or his left foot. Bear also reported to the Use of Force Committee that he was struck in the leg. Additionally, Malone stated that he informed Bear that Plaintiff had initially grabbed him, whereas Bear's report states that when Bear first arrived for his rounds on the range, Malone informed him that Plaintiff had thrown a battery in anger, and that was why he accompanied Malone back to Plaintiff's cell. Plaintiff focuses on these minor inconsistencies in opposition to summary judgment. (Doc. 116 at 11-12). However, minor inconsistencies in the officers' statements about the nature of the altercation between Malone and Plaintiff prior to Bear's arrival, or the accuracy of Plaintiff's aim with the batteries, do not create any genuine issue of material fact that would preclude summary judgment in this case. There is no dispute that after Bear arrived, Plaintiff threw batteries at both officers, eliciting Bear's first deployment of OC spray.

[10]Oleoresin capsicum spray, or "OC spray," is a form of pepper spray, sometimes inaccurately referred to by Plaintiff as "mace."

[11]Due to a technical issue in the readability of Defendants' original Exhibit 4, the undersigned directed Defendants to re-file the video, which they did on November 8, 2018. As Plaintiff points out, the affidavit of William Cool that is intended to authenticate the video record, describes the video as a recording involving Plaintiff during "an incident that occurred on January 19, 2017, involving Inmate Foster…and Corrections Lieutenant Dyer and Corrections Sargent Bear in K2, Cell 6." (Doc. 113-5 at ¶5). The undersigned finds the affidavit reference to the K2 unit to be immaterial, and relies on the video as clearly reflecting the events that occurred on the J3 unit, immediately prior to Plaintiff's transfer to the K2 segregation unit.

13

review the videos. The undersigned directed Defendants to provide two additional opportunities to review the videos, and now concludes that Plaintiff has been afforded a total of three opportunities to review the exhibit but has deliberately refused to do so. (*See generally*, Docs. 124, 125). Even if a reviewing court were to disagree and conclude that Plaintiff should be provided a *fourth* opportunity to review this evidence, that fact would not alter this Court's review of the video record.

Video A shows Malone and Bear entering Plaintiff's cell range at 7:14 a.m. Defendant Bear is holding a canister of O/C spray in his left hand, down at his side, and begins conversing with Plaintiff. At 7:14:17, Plaintiff stands up out of his wheelchair. Seven seconds later, on the video frame recorded at 7:14:24:58, Plaintiff makes an aggressive sudden move, which Bear and Malone both report as throwing a battery. Based on the positions of the parties, the undersigned cannot see Plaintiff's hand, but the frame-by-frame video record is consistent with Plaintiff throwing something. Also visible on the frame-by-frame record is Bear's clearly *reactive* motion. Thus, when Plaintiff leans back and appears to move his arm suddenly, Bear appears to flinch before raising the OC spray in his left hand. For approximately one second, Defendant Bear discharges spray through the bars toward Plaintiff. (See Video A, 7:14:25:081 to 7:14:26:082). In the same second in which he reactively discharges OC spray, Bear is retreating away from Plaintiff's cell, as is Malone. In the ensuing seconds, both officers head toward an exit door to further distance themselves from Plaintiff's cell.

As he retreats, Bear depresses the trigger on his OC spray two additional times. While aimed in Plaintiff's direction, it is unclear whether either of the additional short bursts of OC spray made contact with Plaintiff due to the increasing distance and fact that Bear

was rapidly retreating rather than stopping to aim his spray. After reacting to the initial use of OC spray, the video shows Plaintiff lunging back toward the front of his cell, extending his arm, and throwing a single small battery at the retreating officers. An incident report completed by C/O Randy Cooper reflects that he packed up Plaintiff's cell at approximately 9:45 am, at which time he found two batteries hidden on Plaintiff's bed, and two additional batteries "on the range across from [Plaintiff's] cell," consistent with the Defendants' report that Plaintiff had thrown at least two batteries. (Doc. 113-2 at 21).

Approximately eight minutes later, Bear and Malone returned to the range in order to direct Plaintiff to be transported to Unit K2 (disciplinary segregation). Clearly aware of their approach, Video B shows Plaintiff again moving to the front of his cell and standing up from his wheelchair at 7:22:17, just before the officers entered the range at 7:22:24. This time, Bear carries a canister of OC spray in his right hand. Bear directed Plaintiff to cuff up to be transported to disciplinary segregation. Still agitated, Plaintiff spit at both officers, eliciting another reactive use of OC spray by Bear. (Doc. 113-2 at 2, 16; *see also* Video B at 7:22:33 to 7:22:35). After Bear deploys his OC spray on Video B, the record reflects that he and Malone retreated a few steps from Plaintiff's cell but remained in the cell block for several seconds, observing Plaintiff. During that time frame, Plaintiff retreats to his wheelchair towards the back of his cell and can be seen wiping his face with a white cloth, presumably in an attempt to wipe off OC spray. (*Id.*)

Two neighboring inmates on the J3 range are visible in the videos; both appear to be calm and neither appears to be going "bonkers" as Plaintiff alleges in the amended complaint. At 7:23:00 on Video B, Malone opens the door to one of the neighboring cells to escort its occupant down the hallway. That inmate has covered his face with white

cloth in a presumed attempt to shield his face from any lingering effects of OC spray as he is led calmly down the hallway. By 7:23:17, both Bear and Malone have exited the frame of Video B, accompanying the unknown inmate.

Based upon Plaintiff's behavior, Defendant Bear sought and obtained authorization for a planned Use of Force in order to extract Plaintiff from his cell and transport him to the K2 disciplinary segregation unit. A five-man team was formed. Video C begins more than an hour after Video B leaves off, and reflects a large team response assembling at 8:35:17 a.m. Five men in riot gear (complete with face masks and chest shields) appear, together with a five more staff members not wearing gear. Two staff members gave Plaintiff a direct order to be moved, which Plaintiff initially refused. However, in view of the large show of force exhibited by the extraction team, Plaintiff soon agreed to be moved and no additional force was used, other than the escort techniques used to transport Plaintiff. (*See* Doc. 113-2 at 1; Video C).

Both Unit J3 and Unit K2 are physically located next to a set of stairs. Therefore, C/Os Bradley and Dunlap, both of whom were part of the authorized extraction team, removed Plaintiff from his wheelchair at the bottom of the staircase. While standing next to him, each held one of Plaintiff's arms to escort him up a flight of eight steps from Unit J3. The same two officers then placed Plaintiff back in his wheelchair to transport him down a hallway to Unit K2. Upon arrival at the segregation unit, Plaintiff was again removed from his wheelchair and escorted down the stairs to Cell 6, where he was placed on the bed. (Doc. 113-2 at 5). He was then strip searched. During the search, Plaintiff was found to be in possession of three bars of soap and deodorant, which were logged as four items of contraband. (*See* Doc. 113-2 at 91; Doc.105-1 at 18). Plaintiff was issued

a 24-hour modified property restriction and given a clean pair of orange pants, orange/white shirt, and blue shoes, as well as a single sheet and blanket, and toilet paper. Plaintiff does not dispute that he was provided these items, but complains that he was not provided underwear or additional blankets or sheets.

Plaintiff further complains (and the undersigned assumes for purposes of Defendants' pending motion) that the cell had not been adequately cleaned after the departure of its prior occupant. Therefore, the cell was "dirty" with visible bloodstains left from its prior occupant having cut himself,[12] and Plaintiff observed some areas of mold.

Plaintiff verbally complained of pain upon his arrival to the cell, but does not appear to have made any complaint about the allegedly unsanitary conditions of the cell until the next day. During a physical exam by Nurse Tipton within minutes of his placement in the segregation cell, Plaintiff showed no signs of distress, no edema, no open areas, and no drainage or redness. (Doc. 113-2 at 8, 27; *see also* Doc. 105-1 at 9). There is some evidence that Plaintiff was offered an x-ray but refused that offer, (Doc. 105-1 at 13), but there is no evidence that he sustained any injury. Nurse Tipton documented that both his legs and arms appeared "normal."[13] Plaintiff was provided with over the counter pain relief and advised to wash the areas of his skin that had been impacted by the OC spray. (Doc. 105-1 at 9-10).

As a result of throwing batteries and spitting toward Defendant Bear and C/O Malone, Plaintiff was charged with violations of Rules 5, 6, and 7.[14] In his response in

---

[12]Plaintiff alleges that a neighboring cellmate in K2 told Plaintiff that he had already filed a grievance complaining about the blood stains.

[13]Plaintiff at times disputed whether he had been examined by Nurse Tipton, but he also has filed her medical report as one of his exhibits.

[14]Rule 5 prohibits causing, or attempting to cause, physical harm to another with a weapon. Rule 6 prohibits throwing, expelling, or otherwise causing a bodily substance to come into contact with another. Rule 7

opposition to summary judgment, Plaintiff attached the disposition of his Rules Infraction Board proceeding. The RIB panel judged Plaintiff guilty of all three Rule violations and specifically found that Plaintiff "did spit and throw batteries at SGT. Bear while he was in front of his cell," following review of video evidence and related Conduct and Incident Reports from the officers involved. (Doc. 116 at 69).

A Use of Force Committee later investigated the incident and concluded that the force was reasonable under the circumstances presented. In an interview dated nearly two months after the incident, on March 13, 2017, Plaintiff provided the following statement:

> Cell door popped open & went to shower. I was getting along with officers. They made up …false restrictions on me. Asked C/O Malone about hyg[i]ene, he was disrespectful to me. I told him he couldn't deny my hyg[i]ene. Told them to get a supervisor down here. Sgt. Bear came down & said you ain't getting anything and sprayed me. He had the mace out already. I [threw] some stuff at him.
>
> Question: When asked to move from J3-3 to K2 did you refuse?
>
> I don't recall being asked to move to K2 – did not have legal authority to move me to non[] accessible block.
>
> Question: Did you throw batteries at Sgt. Bear and C/O Malone, hitting C/O Malone?
>
> I black out so I'm not sure what I threw at him. Sgt. Bear came back later & sprayed me a second time. Sgt. Bear was cussing at me.
>
> Question: Did you spit at Sgt. Bear?
>
> I don't recall everything ex[cept], the team came and got me and put me in K2 without a mattress or anything.[15]

---

prohibits throwing any other liquid or material on or at another. *See* Ohio Admin. Code, § 5120-9-06, Inmate Rules of Conduct.

[15]Despite his assertion that the cell lacked a mattress during his Use of Force Interview in March 2017, Plaintiff's January 2017 construed amended complaint does not allege that the cell lacked a mattress, but instead alleges that Defendant Dyer violated his Eighth Amendment rights by placing him in a cell that was dirty, with an "old dirty" mattress which had only one sheet and one blanket. Plaintiff further complains that

(Doc. 113-2 at 31-32). The Use of Force Committee noted that when interviewed, Plaintiff stated that he had PTSD and sort of "blacked out" when the incident happened and did not remember all details. (Doc. 113-2 at 9). Given the discovery of contraband soap and deodorant in Plaintiff's clothing when he was strip searched in disciplinary segregation, and Plaintiff's agitated state, the Use of Force Committee determined it was "more than likely" that Plaintiff "planned on throwing these items at staff also." (*Id.*)

## V. Defendants' Motion for Summary Judgment

Defendants Bear and Dyer have filed a joint motion for summary judgment on the two remaining claims against them. (Doc. 113). The motion is supported by 100 pages of exhibits,[16] as well as a DVD of the video footage of the January 19, 2017 incident. Plaintiff filed a 34-page single spaced, handwritten "response" in opposition to Defendant's motion, which document also constitutes his objections to the sixth R&R. (Doc. 116, Notation Order of 10/26/18). Attached to Plaintiff's combined response/objections are 31 pages of exhibits. In addition to Plaintiff's formal response to Defendants' motion, the undersigned has reviewed and considered exhibits attached by Plaintiff to his "Motion Trumping Penological Interest that Aren't Legit," and two reply memoranda filed in support of Plaintiff's motion for summary judgment. (Docs. 105-1, 110, 111).

---

the cell was not wheelchair accessible, and that without his wheelchair, he was confined to the bed. (Doc. 10 at 2-3).

[16]Unfortunately, Defendants' citations to those exhibits lack appropriate page numbers. A reference to "Exhibit 1" might be adequate in a case where the referenced exhibit consists of a single page but is not adequate when the exhibit spans 92 pages. Counsel is strongly cautioned that this Court will not tolerate such lax citations in the future.

Much of Plaintiff's response and the majority of his exhibits focus on previously dismissed claims and Defendants.  The undersigned declines to reiterate the analysis of prior R&Rs, and therefore limits the majority of her analysis to the only two Defendants and claims that remain at issue.

### A.  Judgment Should be Granted on Eighth Amendment Claims

### 1.  The Components of an Eighth Amendment Claim

An Eighth Amendment excessive force claim has both a subjective and an objective component. *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014).  The subjective component focuses on "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Id.*; *see also Hudson v. McMillian*, 503 U.S. 1, 6, 112 S. Ct. 995 (1992).  In making this inquiry, the Court must consider the need for the use of force; the relationship between that need and the type and amount of the force used; the threat reasonably perceived by the official; and the extent of the injury inflicted.  *Hudson*, 503 U.S. at 7; *Whitley v. Albers*, 475 U.S. 312, 320 (1986).  The Eighth Amendment does not prohibit a de minimis use of force "provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 501 U.S. at 10 (quoting *Whitley*, 475 U.S. at 327) (internal quotations omitted).

The objective component requires the "pain inflicted to be 'sufficiently serious'" to offend "contemporary standards of decency." *Cordell*, 759 F.3d at 580 (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011), and *Hudson*, 503 U.S. at 8).  "While the extent of a prisoner's injury may help determine the amount of force used by the prison official, it is not dispositive of whether an Eighth Amendment violation has occurred." *Id.* at 580-81.  "'When prison officials maliciously and sadistically use force to cause harm,

contemporary standards of decency always are violated ... [w]hether or not significant injury is evident.'" *Hudson*, 503 U.S. at 9. "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Id.* At the same time, courts have repeatedly explained that "not… every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson*, 503 U.S. at 9. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Pelfrey v. Chambers*, 43 F.3d 1034, 1039 (6th Cir. 1995) (internal quotation marks and citation omitted).

### 2. No Evidence Supports Either Subjective or Objective Elements of Plaintiff's Excessive Force Eighth Amendment Claims

It is undisputed that Defendant Bear responded to Plaintiff's cell after Plaintiff engaged in some form of dispute or altercation with C/O Malone concerning Plaintiff's belief that Malone was improperly denying him access to his medicated soap. It is further undisputed that when Bear responded by accompanying Malone back to Plaintiff's cell, Plaintiff threw batteries at Bear. (Video A; *see also* Doc. 116 at 20, denying a physical altercation with Malone and arguing that "[t]he only …altercation was Foster throwing a battery at Bear to deter his unreasonable attack of discrimination"). In response to Plaintiff's throwing a battery at him and/or Malone, Bear deployed OC spray and left the range. (Video A). After Bear returned to order Plaintiff to move to a disciplinary segregation unit approximately 8-10 minutes later, Plaintiff spit at Bear and Malone. Bear then deployed his OC spray a second time. (Video B).

Based upon Plaintiff's behavior and initial refusal to be moved to disciplinary segregation, a "Use of Force" authorization was given for a five-man extraction team to

transport Plaintiff to segregation.  Soon after that team arrived, Plaintiff complied with the order to be moved.  He was removed from his wheelchair, with two officers escorting him up eight steps in order to leave Unit J3, wheeled down the hall and again escorted down a second set of steps to Unit K2, and physically placed on the bed in Cell 6.  During a subsequent strip search, he was found to be in possession of four items of contraband (soap and deodorant) and was issued a 24-hour modified property restriction and provided with clean pants, shirt, and shoes.  He was also provided with a sheet, a blanket, and toilet paper.

Nurse Tipton examined Plaintiff in his cell.  Despite verbal complaints of pain, Plaintiff had no discernable injuries on examination.  Indeed, he does not allege any particular injury but primarily complains about the alleged "risk" of injury from being escorted up and down stairways at SOCF as opposed to being transported entirely via wheelchair.  Given his lack of visible injury, Nurse Tipton provided Plaintiff with pain relief and advised him to wash any areas that were impacted by OC spray.

As this Court explained more than a year ago in denying preliminary injunctive relief:  "The use of pepper spray to restore discipline, including for the failure to comply with the order of a correctional officer rarely (if ever) will violate an inmate's constitutional rights."  (Doc. 78, R&R at 14, internal citation omitted).  On the undisputed facts presented, Defendant Bear exerted a de minimis use of force (OC spray) to restore order in the face of assaultive behavior by Plaintiff.  Such force is insufficient as a matter of law to establish either the objective or subjective elements of Plaintiff's claim.

Plaintiff accuses Bear and Dyer of using additional force to transport him to the disciplinary segregation cell in K2.  However, the record reflects that it was C/Os Bradley

and Dunlap, and not either of the two Defendants, who physically held Plaintiff's arms during his escort up and down the two flights of stairs required to reach K2. Even if it had been Bear and Dyer, such minimal force would not violate the Eighth Amendment given Plaintiff's initial repeated refusal to be transported to disciplinary segregation. While the de minimis nature of the force is critical, the record further reflects that Plaintiff sustained no injury other than the transient discomfort of the OC spray, which the evidence reflects he had the means to wash off, despite being temporarily denied access to his medicated soap.[17] Thus, Plaintiff cannot satisfy the objective component of his claim: that the harm suffered was sufficiently "serious."

Plaintiff also cannot show any malicious and sadistic intent to harm him by either of the Defendants, and therefore cannot prove the subjective component of his Eighth Amendment claim.[18] Plaintiff was charged with and found guilty of three separate rule violations based on the incident. The use of OC spray in the face of an agitated inmate throwing batteries and attempting to spit at officers does not violate the Eighth Amendment. Multiple cases hold that OC spray may be deployed in order to maintain order and restore discipline, including for rule violations, and even when an inmate remains in his cell. *See, e.g., Davis v. Agosto*, 89 Fed. Appx. 523, 526 (6th Cir. 2004) (collecting cases and holding use of mace against inmate who failed to place hands next to the tray slot as directed while in his cell was a good-faith effort to maintain or restore

---

[17]In his response in opposition to summary judgment, Plaintiff asserts that "the nurse tried to get me to let them…lift him upstairs to go to a chronic care visit" but that Plaintiff refused and "informed her he would not take that risk because there is no [wheelchair] ramp." (Doc. 116 at 25).

[18]In Plaintiff's response in opposition to Defendant's motion, he argues that Defendants have waived most defenses, including the argument that Plaintiff has failed to prove the subjective element of his Eighth Amendment claim. (Doc. 116 at 14-15). Plaintiff is mistaken. Although the undersigned has noted that Defendants appear to have waived an exhaustion defense in their current motion for summary judgment, they did not waive other defenses by failing to present every possible argument in their opposition to Plaintiff's third motion for summary judgment.

discipline). As recognized in *Davis*, courts have repeatedly upheld the use of pepper spray or mace to avert a threat or to force a recalcitrant inmate to comply with an order. *See generally, e.g., Brown v. Perez*, 2017 WL 3378994 (6th Cir. April 17, 2017) (affirming *sua sponte* dismissal of *pro se* prisoner complaint on initial screening under PLRA, 28 U.S.C. §§ 1915A(b) and 1915(e)(2)(B)(ii); officers' alleged use of tear gas and physical restraints did not constitute violation of Eighth Amendment where allegations indicated that force was to maintain or restore discipline rather than maliciously and sadistically to cause harm); *McDougald v. Dillow*, Case No. 1:16-cv-1099 (S.D. Ohio Aug. 2, 2018) (summary judgment granted to defendants for use of pepper spray); *McDougald v. Erdos*, Case No. 1:17-cv-95, 2018 WL 3772181 (S.D. Ohio Aug. 9, 2018) (same); *Thompson v. Esham*, Case No. 1:15-cv-553, 2018 WL 398439 (S.D. Ohio Jan. 12, 2018) (summary judgment granted despite use of multiple short bursts of pepper spray); *Payne v. Gifford*, Case No. 1:16-cv-514, 2017 WL 4329631 (S.D. Ohio Sept. 5, 2017) (holding that one-second use of pepper spray demonstrated neither subjective nor objective components of Eighth Amendment claim); *Phillips v. Sammons*, Case No. 1:16-cv-1034 at *11 (S.D. Ohio Jan. 11, 2018) (granting summary judgment where officer deployed chemical spray for less than two seconds).

As the undersigned wrote in a similar case:

> To be clear, when pepper spray or some other chemical agent is used against a prisoner, that use of force might support the objective component of an Eighth Amendment claim when combined with other force (i.e., a "violent extraction"), or if the spray was used for an excessive length of time, employed in some obviously malicious manner, or under circumstances that demonstrate a more objectively significant incident. *See e.g., Freeman v. Collins*, 2009 WL 414325 (S.D.OH Feb. 17, 2009) (denying qualified immunity to officer who sprayed inmate with mace based on disputed issues; inmate had medical documentation prohibiting use of chemical agents, and allegedly was denied medical treatment after the incident).

> However…, where it is clear that some manner of threat by Plaintiff occasioned the briefest reactive use of pepper spray by a single prison guard, with no other force used by that guard or by anyone else, the undersigned concludes that the force used was akin to a "push or shove" that causes "no discernible injury" and that falls short of what is required to state a valid Eighth Amendment claim.

*Thompson v. Joseph*, Case No. 1:12-cv-992, 2014 WL 1685918 (S.D. Ohio, April 29, 2014), R&R adopted at 2014 WL 2172894 (discussing OC spray cases and granting summary judgment in light of evidence that use of force was de minimis because it was in response to the inmate's verbal threat and/or attempt to spit); *accord Easley v. Little*, 2016 WL 4006676 at *7 (S.D. Ohio June 28, 2016) (citing *Jennings v. Mitchell*, 93 Fed. Appx. 723, 724 (6th Cir. 2004) and similar pepper spray cases).

Like the cited cases, the undisputed record in this case reflects that a single officer (Bear) deployed short bursts of pepper spray against Plaintiff in response to clear threats (batteries being thrown and Plaintiff spitting) as well as Plaintiff's refusal to be removed and transported to disciplinary segregation. Once the extraction team arrived, Plaintiff complied with the removal order without further incident or use of any force other than a de minimis physical escort technique used by other officers (not the Defendants) to transport him up and down two short flights of stairs. Therefore, Defendant Bear is entitled to summary judgment on Plaintiff's claim that he used excessive force in violation of the Eighth Amendment.

### 3. No Evidence to Support Conditions of Confinement Claim

Both Defendants Bear and Dyer are also entitled to summary judgment on Plaintiff's conditions-of-confinement claim, which is based upon multiple underlying presumptions that are not supported by the record. For example, Plaintiff asserts that the State of Ohio is required to house him in a handicap-accessible cell, in a different prison

than SOCF (which Plaintiff asserts has no suitable cell blocks) and provide him with access to his personal wheelchair at all times. (*See, e.g.*, Doc. 116 at 16). As a foundational premise to his claim against the two Defendants, Plaintiff decries Dr. Ahmed's medical determination beginning in 2014 and reiterated in a document dated January 19, 2017, that Plaintiff requires a wheelchair only for long distances and not at all times. Plaintiff alleges that medical decision itself violates the Eighth Amendment. (*See e.g.*, Doc. 116 at 38-42 (grievances complaining in 2014 that Dr. Ahmed took away wheelchair and medicated shampoo); *Id.* at 47, 53-54 (Medical Exam notes and Restriction dated September 2014 stating that wheelchair "for long distance ambulation due to refusal to walk"); *see also* Doc. 116 at 73 (7/20/17 Nurse Progress note relating medical history of left leg paralysis resolved 8/2011. Not paralyzed on exam 9/26/2014").

To support his assertion that Defendants Bear and Dyer violated his Eighth Amendment by not permitting him to retain his wheelchair in disciplinary segregation, Plaintiff cites to a medical exhibit, dated 09/09/16, that states that Plaintiff is to be "[a]llow[ed] to use wheelchair in cell" due to his muscle weakness and history of chronic pain. However, even assuming that the same allowance continued through January 19, 2017, evidence that Plaintiff was *allowed* use of a wheelchair in his cell in Unit J3 is not the equivalent of a medical *requirement* for wheelchair use in Unit K2. In fact, the 2016 physical examination findings reflected on the medical note "allowing" the wheelchair reflect a "normal" gait and full range of motion, despite some atrophy in Plaintiff's left leg. (Doc. 116 at 65).[19] Most importantly, regardless of what Plaintiff believes regarding whether his placement at SOCF is appropriate or whether Dr. Ahmed erred in his medical

---

[19]On the same date, the examiner diagnosed contact dermatitis and other unspecified eczema, and prescribed medicated shampoo. (*Id.*)

assessments that Plaintiff did not technically "require" access to his wheelchair at all times, no claims relating to those beliefs remain at issue in this case.

In the lone claim that remains, Plaintiff alleges that Defendant Dyer (and possibly Bear)[20] were part of the team who transported Plaintiff to a cell that was not "handicap accessible."  Again relying solely on evidence that he previously had been allowed *access* to his wheelchair in his cell in Unit J3,[21] Plaintiff argues that the removal of that access in Unit K2 violated the Eighth Amendment.  Plaintiff also asserts that he "could not take a shower" because he needed "his medicated shampoo, etc." (Doc. 116 at 24).  In his construed amended complaint, Plaintiff further alleges that his Eighth Amendment rights were violated because the K2 cell was "dirty" and had not been adequately cleaned after its last occupant moved out.  Plaintiff alleges that he observed bloodstains, dirt, and areas of mold.[22]  He further alleges that he was provided with clothes but not with underwear and was provided only a single sheet and blanket for the bed.

Both Defendant Dyer and Bear are clearly entitled to summary judgment on this claim.  In order to prove the objective element of his conditions of confinement claim, Plaintiff must demonstrate that the harm to which he was subjected was "objectively, sufficiently serious," such "a prison official's act or omission must result in the denial of

---

[20]It is unclear from the amended complaint whether Plaintiff believes that Bear was part of the transport team.  The record suggests that only Dyer, and not Bear, accompanied Plaintiff to Unit K2.

[21]Plaintiff does not deny that he stood up multiple times while in his J3 cell, but insists that he "used his good leg" to do so, and otherwise requires access to his wheelchair at all times despite Dr. Ahmed's contrary opinions. (*See* Doc. 113-2 at 86).

[22]Defendants have offered recent pictures of the offending cell as an exhibit, which pictures Plaintiff maintains do not fully reflect the condition of the cell on January 19, 2017.  Nevertheless, Plaintiff relies on the same pictures as providing proof of what Plaintiff alleges are small areas of mold on a rear vent, on the bookshelf, and on the sink.  Other than some darkened areas of unknown origin near the bookshelf, the referenced areas are impossible to detect.  Even if the areas are mold as Plaintiff alleges, for the reasons discussed and based on established law, the undersigned does not find that such conditions are so horrific that they would violate the Eighth Amendment, even if Plaintiff had proven the subjective component of his claim (which he has not).

'the minimal civilized measure of life's necessities,'" *Farmer v. Brennan*, 511 U.S. 825, 833, 114 S.Ct. 1970, 1977 (1994) (quoting *Rhodes*, *supra*, 452 U.S. at 347, additional internal quotation marks and citations omitted).  Put another way, for a claim "based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  *Id.* at 834, citing *Helling*, *supra*, 509 U.S. at 35.

Plaintiff does not allege that he requested his wheelchair or other amenities from Bear and Dyer.  However, with respect to any part that those two Defendants may have played in failing to allow Plaintiff to access his wheelchair in his disciplinary segregation cell, Plaintiff has failed to offer any evidence that his lack of access posed a substantial risk of serious harm.  Defendants Bear and Dyer were entitled to rely upon the assessments made by medical personnel at SOCF, including the nurse who examined Plaintiff at the time he was placed in the disciplinary cell and Dr. Ahmed's assessment later that day that Plaintiff did <u>not</u> require continuous access to his wheelchair while housed in disciplinary segregation.[23]

Both Defendants Bear and Dyer also are entitled to judgment with respect to Plaintiff's complaints that he was temporarily deprived of underwear despite being provided a clean shirt and pants, and that he should have been provided with more than one sheet and blanket.  Again, Plaintiff fails to allege that he asked Bear or Dyer for underwear or for additional sheets or blankets, or indeed, that he voiced any complaint at

---

[23]Plaintiff points out that Dr. Ahmed's January 19, 2017 assessment that his wheelchair was not required while Plaintiff was in segregation was not signed until 2 p.m., several hours after Plaintiff was transported to Unit K2.  (Doc. 113-4 at 1).  However, the assessment is nearly identical to a prior assessment dated in 2014, and Plaintiff offers absolutely no evidence that he was medically required to have access to his wheelchair at all times, or that he suffered any actual harm or risk of serious harm.

all to either Defendant about the allegedly unsanitary conditions of the cell. However, even if there were evidence that Bear or Dyer had any personal involvement in the alleged deprivations (a prerequisite to liability), the alleged temporary discomfort does not rise to the level of an Eighth Amendment violation.

It is true that conditions-of-confinement cases are highly fact-specific. However, "[i]n general, the severity and duration of deprivations are inversely proportional, so that minor deprivations suffered for short periods would not rise to an Eighth Amendment violation, while '*substantial* deprivations of shelter, food, drinking water, and sanitation' may meet the standard despite a shorter duration." *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) (emphasis added internal citation omitted). The initial placement of Plaintiff in a disciplinary cell with clean clothing but without undergarments, and/or without more than one sheet and blanket, is not a "substantial deprivation" under the requisite standards. *See Grissom v. Davis,* 55 Fed. Appx. 756, 757 (6th Cir. 2003)(deprivation of a mattress, blankets or other bedding for six days did not violate the Eighth Amendment).

Leaving aside for a moment the question of whether dirt, bloodstains, and mold could up the ante sufficiently to meet the objectively "serious" standard required by the Eighth Amendment, there is no question that both Defendants also are entitled to summary judgment based upon Plaintiff's failure to prove the subjective element of his claim. "A prison official cannot be found liable... for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S. Ct. at 1979. Plaintiff has

produced no evidence to suggest that either Bear or Dyer were aware of any serious health or safety concern posed by Plaintiff's placement in the cell. Proof of the subjective component as to each Defendant is required, as the Supreme Court has long rejected "a reading of the Eighth Amendment that would allow liability to be imposed on prison officials solely because of the presence of objectively inhumane prison conditions." *Id.* at 838 (quoting *Wilson v. Seiter*, 501 U.S. 294, 299-300, 111 S. Ct. 2321, 2324-2326 (1991)).

Not only is there no evidence that either Bear or Dyer were actually aware of inhumane conditions, but Plaintiff does not even <u>allege</u> that he complained to Bear or Dyer, or that he requested any cleaning supplies or change to a different K2 cell. Instead, Plaintiff's construed amended complaint alleges that after he was "left in the cell," he "sat on the steel bunk, only to observe the blood all over the floor walls and sink of this disgusting condemned moldy cell." (Doc. 10). In other words, Plaintiff implies that only after he was left alone in the cell did he first observe the allegedly unsanitary conditions. It is beyond dispute that liability under § 1983 must be based on active unconstitutional behavior, not on a failure to act. *See Green v. Barber,* 310 F.3d 889, 899 (6th Cir. 2002); *Salehpour v. Univ. of Tenn.,* 159 F.3d 199, 206 (6th Cir. 1998) (liability must be based upon active unconstitutional behavior).

A copy of a grievance submitted by Plaintiff in opposition to summary judgment is consistent with the conclusion that neither Bear nor Dyer were aware of Plaintiff's complaints or actively caused the conditions about which Plaintiff complains. The grievance is dated January 20, 2017, the day *after* he was moved to the offending cell. The Informal Complaint Resolution ("ICR") is addressed to the Warden and Institutional

Inspector Mahlman, not to Defendants.  In his ICR, Plaintiff complains that he was moved to a cell

> without my wheelchair or any accessibility.  Furthermore these conditions are too much for anyone to go through.  The cells and ground are corroded, and depressing, blood, mold & guck are on the entire surface of this unit.  No recreation.  No TV.  No phone, J-pays are not being returned with reply stamp.  I have not had my hygiene, or legal property etcetera. No change of uniforms, no letters, no electronics, constant lights.  You are purposely ruining our relationships all for the purpose of oppression.  No blanket, sheet.  Inappropriate supervising CO's etcetera, nurses, and supervisors threatening and disrespecting 24 hours.  If you are not going to do anything about this we need grievances because we had enough.  Do something or send Grievance form.  This is extreme and outrageous.

The ICR bears the names of six inmates. (Doc. 116 at 74).  The response by Warden Erdos instructs the six inmates (including Plaintiff) that grievances must be individual in nature, and submitted to the appropriate supervisor.  The response also explains how to obtain additional grievance forms in order to make an individual complaint.

 Even if Plaintiff had produced evidence that Bear and Dyer possessed a "sadistic and malicious" intent to harm him when they placed him in the disciplinary segregation cell, and/or that they were made aware of the allegedly unsanitary conditions and refused to provide a remedy, the Defendants still would be entitled to judgment because Plaintiff cannot prove the objective component of his claim.  While the alleged filth arguably was a more serious deprivation than the temporary denial of underwear, the conditions of which Plaintiff complains still fail to rise to the level of a constitutional deprivation, in the absence of any showing of harm.

Cases alleging unsanitary prison conditions are quite common.  Yet few cases rise to the level of a constitutional deprivation. That is because the Eighth Amendment is only concerned with "deprivations of essential food, medical care, sanitation," or "other

conditions intolerable for prison confinement." *Rhodes v. Chapman,* 452 U.S. 337, 348, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). "Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey v. Wilson,* 832 F.2d 950, 954 (6th Cir.1987). Not infrequently, inmates deliberately cause unsanitary conditions as a means of protest, or because they are mentally ill. Colloquially speaking, the "yuck" factor influences the assessment of the severity of the deprivation to sanitation and level of risk to health and safety. For example, cases involving large amounts of raw sewage tend to evoke greater concern than small puddles or stains.

In assessing the objective risk, courts take a commonsense approach. Here, Plaintiff has not alleged that he suffered any injury from his alleged exposure to grime and bloodstains. There is no dispute that the cell was equipped with a working sink. And Plaintiff does not allege that he requested cleaning supplies or a cell change, or that he made any complaint to anyone prior to his submission of the January 20, 2017 ICR.

In a multitude of cases, courts have held that even fairly long exposure to unsanitary conditions will not satisfy the objective component of the Eighth Amendment in the absence of any physical harm. *See e.g. Keel v. Davidson County Sheriff's Office*, 2015 WL 799724 *3 (M.D. Tenn. Feb. 25, 2015) ("Multiple courts have found that exposure to leaking sewage in a prison cell with no accompanying physical harm is insufficient to satisfy the objective component of a constitutional violation," collecting cases and granting summary judgment to defendants where inmate complained of sewage leak above his cell for 3 weeks before a work order was placed, but alleged no physical harm); *Antonelli v. Walters*, 2009 WL 921103 at *20 (E.D. Ky. March 31, 2009)

(claim of leak and raw sewage in cell resulting from failure to maintain pipe chase failed to state Eighth Amendment violation in the absence of allegation of physical harm); *Gofarth v. Sumner County*, 2013 WL 1943020 at \*3 (M.D. Tenn. May 9, 2013) (confinement in cell with door covered with feces failed to state claim under 8th Amendment where no injury occurred); *Lamb v. Howe*, 677 Fed. Appx. 204 (6th Cir. 2017) (upholding dismissal for failure to state a claim, when prisoner alleged that he was denied a mop with which to clean up a cell flooded with several inches of toilet water by neighboring inmates who intentionally flooded their cell, and that he slipped and fell causing head injury that required stitches). Based on the referenced case law, as unpleasant and distasteful as Plaintiff's cell conditions may have been, they were not so inhumane or intolerable as to violate the objective standards of the Eighth Amendment as a matter of law, in the absence of any physical injury. *Accord McGowan v. Cantrell*, 2007 WL 2509704 at \*11 (E.D. Tenn. Aug. 30, 2007) ("Although the smearing of feces, urine, blood, and other body fluids on the prisons walls contributes to an unhealthy environment, McGowan has not shown that it presented a substantial serious risk to his health and defendants knew of and disregarded that risk.")

### 4. Qualified Immunity

Last, Defendants Bear and Dyer are entitled to qualified immunity on both claims. The purpose of qualified immunity is to provide governmental officials with the ability "reasonably to anticipate when their conduct may give rise to liability for damages." *See Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (internal quotation omitted). Thus, a governmental official performing discretionary functions will be entitled to qualified immunity unless his actions violate "clearly established statutory or constitutional rights

of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A governmental official is entitled to immunity if the facts alleged do not make out a violation of a constitutional right, or if the alleged constitutional right was not clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 129 S.Ct. 808 (2009).

Plaintiff does not suggest that the Defendants acted outside their authority as correctional officers. For the reasons previously discussed, Plaintiff's allegations fall short of establishing any Eighth Amendment claim. Moreover, because neither Defendant is alleged to have had any personal involvement in the conditions of the disciplinary segregation cell, both Defendants are entitled to qualified immunity on that claim. *See also, generally, Ruiz-Bueno III v. Scott*, 639 Fed. Appx. 354 (6th Cir. Feb. 2, 2016) (holding that defendants were entitled to qualified immunity because confinement in a cell that fell below minimal standards of decency did not violate clearly established law).

### V. Plaintiff's Third Motion for Summary Judgment

Given the extensive analysis provided above, there is little more to say about Plaintiff's third motion for summary judgment. As with his prior motions for summary judgment, the vast majority of Plaintiff's third motion concerns claims and Defendants previously dismissed by this Court under prior rulings, including but not limited to prior screenings under 28 U.S.C. § 1915 and the Court's grant of judgment on multiple claims to most Defendants. Most of Plaintiff's exhibits predate the time frame and/or do not concern any issue that remains in this case. The few exhibits that are relevant to the two remaining claims against Defendants Bear and Dyer have been fully considered in the context of Defendants' motion.

## VI.  Conclusion and Recommendations

For the reasons discussed above, **IT IS RECOMMENDED THAT:**

1.  Defendants' Motion for Summary Judgment (Doc. 113) should be **GRANTED**, with all remaining claims to be dismissed, and this case to be closed;

2.  Plaintiff's (third) Motion for Summary Judgment (Doc. 108) should be **DENIED;**

3.  Following the entry of judgment in favor of the Defendants, this case should be **CLOSED**;

4.  Consistent with this Report and Recommendation, Plaintiff's motion to strike the Defendants' Notice and/or motion to strike the video exhibit submitted in support of Defendants' motion for summary judgment (Doc. 120) should be **DENIED**.


                                         _/s Stephanie K. Bowman_
                                         Stephanie K. Bowman
                                         United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CHRISTOPHER FOSTER,                          Case No. 1:16-cv-920

       Plaintiff,                              Black, J.
                                            Bowman, M.J.
   v.

STATE OF OHIO, et al.,

       Defendants.


## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).